10-4749-cv
SEC v. Obus

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2011

(Argued: November 18, 2011    Decided: September 6, 2012)

Docket No. 10-4749-cv

------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff-Appellant,

                    -- v. --

NELSON J. OBUS, PETER F. BLACK, THOMAS BRADLEY STRICKLAND,

        Defendants-Appellees,

WYNNEFIELD PARTNERS SMALL CAP VALUE L.P., WYNNEFIELD PARTNERS SMALL CAP VALUE L.P. I, WYNNEFIELD PARTNERS SMALL CAP VALUE OFFSHORE FUND, LTD.,

        Relief Defendants.

------------------------------------------------------x

B e f o r e :   WALKER, RAGGI and CARNEY, Circuit Judges.

        The Securities and Exchange Commission ("SEC") appeals from an order of the District Court for the Southern District of New York (George B. Daniels, Judge) granting summary judgment to defendants Nelson J. Obus, Peter F. Black, and Thomas Bradley Strickland on the SEC's claims of insider trading in violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.  We hold that the SEC established genuine issues of material fact with respect to its claims of insider trading under the misappropriation theory. VACATED and REMANDED.

DAVID LISITZA (Mark D. Cahn, Michael A. Conley, Mark Pennington, on the brief), Securities and Exchange Commission, Washington, DC, for Plaintiff-Appellant.

JOEL M. COHEN, Gibson Dunn & Crutcher LLP, New York, NY (Mary Kay Dunning, Christopher Muller, Gibson, Dunn & Crutcher LLP, New York, NY, David Debold, Gibson, Dunn & Crutcher LLP, Washington, DC, on the brief), for Defendant-Appellee Nelson Obus.

Mark S. Cohen, Sandra C. McCallion, Jonathan S. Abernethy, Cohen & Gresser LLP, New York, NY, for Defendant-Appellee Peter F. Black.

Roland G. Riopelle, Sercarz & Riopelle, LLP, New York, NY, for Defendant-Appellee Thomas Bradley Strickland.

JOHN M. WALKER, JR., Circuit Judge:

The Securities and Exchange Commission ("SEC") filed this civil enforcement action against defendants Nelson J. Obus, Peter F. Black, and Thomas Bradley Strickland alleging insider trading in violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. The SEC alleges that Strickland learned material non-public information in the course of his employment and revealed it to Black, his friend and a hedge fund employee, and that Black in turn relayed the information to his boss, Obus, who traded on the information. The District Court for the Southern District of New York (George B. Daniels, Judge) granted summary judgment in favor of the defendants

on both the classical and misappropriation theories of insider trading. We hold that the SEC's evidence created genuine issues of material fact as to each defendant's liability under the misappropriation theory, and therefore that summary judgment for the defendants was erroneous. VACATED and REMANDED.

BACKGROUND

**I.   Facts**

We recite only those facts pertinent to this appeal. As the non-moving party, the SEC is entitled to have all factual inferences drawn in its favor. See Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 456 (1992). The facts are undisputed unless noted otherwise.

**A.   The Planned Acquisition of SunSource and GE Capital's Financing Bid**

In May 2001, Strickland worked as an assistant vice president and underwriter at General Electric Capital Corporation ("GE Capital"), a Connecticut-based company that provides corporate financing. Defendants' Statement of Undisputed Facts ("Def. 56.1 Stmt.") ¶¶ 3, 23-26, 82; Joint Appendix ("JA") 351 27:13-17. That spring, Allied Capital Corporation ("Allied") had approached GE Capital about financing Allied's planned acquisition of SunSource, Inc. ("SunSource"), a publicly traded company that distributed industrial products. JA 373 70:18-71:4; 301 93:14-94:23; 2301. Strickland was assigned to perform due diligence on SunSource as part of the GE Capital team working on the SunSource/Allied

financing proposal. JA 299-300 88:2-89:5; 373 70:5-9; 454-55 59:24-60:12; 646 113:6-8. His tasks included analyzing SunSource's financial performance, but the parties dispute whether Strickland was authorized to gather information about SunSource's management. Def. 56.1 Stmt. ¶¶ 65-66; SEC's Response to Defendants' Joint Statement of Material Facts ("Pl. 56.1 Resp.") ¶¶ 65-66; 353-54 31:4-32:5.

In the course of his work, Strickland learned non-public information about SunSource, including the basic fact that SunSource was about to be acquired by Allied. Strickland testified that he understood that Allied's acquisition of SunSource was confidential. JA 314 146:8-10; 379-80 83:6-85:14; 383 90:4-91:2; 384 92:6-13. Each page of the transaction's deal book, which Strickland received, was marked "Extremely Confidential." JA 2308-24. In addition, Strickland had reviewed and annually signed GE Capital's employee code of conduct, which required employees to "safeguard company property [including] confidential information about an upcoming deal." JA 2270; see JA 314 148:10-22; 436 23:5-22. GE Capital also maintained a transaction-restricted list, containing the companies about which GE Capital and its employees possessed material non-public information, and which were therefore off-limits for securities trading. Def. 56.1 Stmt. ¶ 72; JA 554-55 123:11-124:3; 730 122:6-123:4; 2342-43. SunSource and Allied were not placed on the Transaction Restricted List until June 19, 2001, after Strickland and the GE Capital team had completed their due

diligence work and submitted a financing proposal to Allied. Def. 56.1 Stmt. ¶ 71. The parties dispute whether, under GE Capital policies, SunSource should have appeared on the Transaction Restricted List at an earlier date, and whether it was among Strickland's responsibilities to add SunSource to the list. Pl. 56.1 Resp. ¶ 73; JA 371-72 67:14-68:7; 646 113:2-8; 730 123:1-9.

**B. The Alleged Tip from Strickland to Black**

In the spring of 2001, Black, a friend of Strickland's from college, worked as an analyst at Wynnefield Capital, Inc. ("Wynnefield"), which managed a group of hedge funds. Def. 56.1 Stmt. ¶¶ 8-10, 12; JA 313 141:5-6; 933 23:10-19. In the course of his due diligence research, Strickland learned from publicly available sources that Wynnefield was a large holder of SunSource stock. JA 312 138:9-140:19; 399-400 123:19-124:16.

On May 24, 2001, Strickland and Black had a conversation about SunSource. We note that Strickland remembered the conversation taking place face-to-face; Black recalled a telephone conversation. Def. 56.1 Stmt. ¶ 98; Pl. 56.1 Resp. ¶ 98. The SEC and the defendants dispute what was said during this conversation. Def. Br. at 44 n.5. The defendants maintain that Strickland asked Black his opinion of SunSource's management as part of Strickland's due diligence work. Strickland testified that it was common to contact third parties while performing due diligence, and that his practice during such inquiries was to avoid revealing details by stating only that GE Capital was potentially doing business with the

5

relevant company. Def. 56.1 Stmt. ¶¶ 100-102, 104-106; JA 313 142:4-24; 315 149:19-150:1; 336 233:13-234:16; 851-52 148:2-149:4. The SEC maintains that Strickland revealed material non-public information by telling Black that Allied was about to acquire SunSource. Pl. 56.1 Resp. ¶¶ 100-102, 104-106. The SEC relies on testimony that contacting large shareholders was not standard due diligence practice at GE Capital and that Strickland and Black discussed SunSource after GE Capital had completed its financing proposal. JA 301 93:12-16; 463 77:2-6, 574 162:21-163:12; 745-46 153:23-154:19; 2325-30. The SEC further argues that events following Strickland and Black's May 24 conversation, described below, raise a strong inference that Strickland told Black about the SunSource/Allied acquisition.

**C.   The Alleged Tip from Black to Obus**

Obus was Wynnefield's principal and Black's boss. Def. 56.1 Stmt. ¶ 1; 934 24:2-16. Immediately after Black's conversation with Strickland, Black relayed the information he had learned to Obus. JA 852 149:21-150:2; 861-62 163:22-165:11; 981 118:15-25; 1030 42:19-43:19. Black maintains that Strickland's general questions about SunSource's management led Black to suspect (based on SunSource's prior public actions) that SunSource was considering a transaction that would dilute existing shareholders. JA 852-53 148:25-150:3. Black testified that he conveyed this suspicion to Obus. JA 852 149:21-150:3. The SEC contends that Black told Obus

6

that SunSource was about to be acquired by Allied. Pl. 56.1 Resp. ¶¶ 111-112.

**D. Obus's Call to Andrien**

Later that same day, Obus called Maurice Andrien, SunSource's CEO. Def. 56.1 Stmt. ¶ 122; JA 850 146:12-147:23; 853 150:4-12; 854 152:8-18; 1360 169:7-10. As a large SunSource shareholder, Obus regularly spoke to Andrien about the company. Def. 56.1 Stmt. ¶ 121. Obus and Andrien gave different accounts of this phone call. Obus testified that the information from Black led him to believe that SunSource was considering a transaction that would dilute the value of its public shares, and he called Andrien to voice his concerns. JA 853 150:4-23; 1030-31 43:20-23; 1032 45:20-46:10; 1088 139:3-13; 1360-61 169:11-171:3. Andrien testified that Obus informed him that Wynnefield had been tipped about SunSource's imminent acquisition:

> [I]t was a very funny conversation. And he [Obus] said that he never had a conversation like this before, and didn't know whether he should be having it.
>
> He said[,] I always knew you guys would sell SunSource Technology Services [a subsidiary of SunSource] if you could, but I never figured you'd sell the whole company.
>
> And I said, Nelson, that's just not the kind of thing that I could ever discuss under any circumstances with you. Whether we did, or we didn't, I just refuse to comment about that.
>
> He said, well, a little birdie told me that you guys are planning to sell the company to a financial buyer. I said, a little birdie; he said, a little birdie in Connecticut.

7

I said, a little birdie in Connecticut, and he said --I might have even said[,] who would tell you something like that. And he said GE.

JA 1449 134:11-135:2; 1721-22 542:14-544:17. The term "financial buyer" referred to a buyer planning to add SunSource to an investment portfolio, as opposed to a "strategic buyer" looking to acquire SunSource for its assets and business capabilities. JA 1355 159:2-19. Black overheard what Obus said on the phone to Andrien. Consistent with Obus's testimony, Black testified that Obus said that a "guy" from "a big conglomerate in Fairfield" might be working with SunSource and that Obus hoped SunSource would not dilute shareholders. JA 853 150:4-12; 863 168:2-8; 983-84 123:19-124:8.

In any event, whether the Obus call to Andrien was as described by Black and Obus or as described by Andrien, Black was "shocked" to hear Obus make the call, and tried to signal Obus to stop talking. JA 853 150:13-151:10; 862-63 165:25-167:7. After Obus hung up, Black said, "what are you doing? . . . You realize, you know, my friend is going to be fired." JA 853 150:13-151:3. Obus then became "ashen" and "very upset" because he realized "it was a kind of call that could be traced back to" Strickland. JA 853 151:1-5; 1365-66 179:21-180:2. Obus said if Strickland were fired, Obus would offer Strickland a job at Wynnefield or would help Strickland find another job on Wall Street. JA 853 151:6-10; 987 130:4-10.

### E.   Weber's Call to Andrien

On the same day that Obus spoke with Andrien, Andrien also took a call from Alan Weber, a business acquaintance of Obus's and another large investor in SunSource.  JA 1140-43 226:7-229:15; 1709 518:20-519:10; 1710 521:8-522:7.  On the call, Weber told Andrien he hoped that SunSource would not be sold to a financial buyer--the same term Andrien recalled Obus using in his phone call.  JA 1448 125:16-23; JA 1716-17 533:5-535:2.  The two calls from Weber and Obus led Andrien to be "fairly certain" that news of the planned SunSource/Allied acquisition had been leaked.  JA 1724-26 549:21-552:7.

### F.   The June 8, 2001 Trade

On June 8, 2001, two weeks after the conversation between Strickland and Black, a trader at Cantor Fitzgerald contacted Wynnefield offering 50,000 shares of SunSource at $5.00 per share.  JA 2231 70:5-71:8; 2249-50 107:5-108:23.  Wynnefield counteroffered $4.75 per share, and ultimately purchased at that price a total block of 287,200 shares, about five percent of SunSource's outstanding common stock.  JA 1126 201:11-16; 1130 208:2-6; 1134 216:1-7; 2231 70:5-71:8; 2249 106:4-107:23; 2407.  Obus testified that he was unaware of the pending acquisition when he made the trade and that his decision to buy had nothing to do with Strickland's conversation with Black.  JA 1132 211:9-17; 1133-34 214:18-215:7; 1138 222:12-15.  The June 8, 2001 purchase represented about the same number of shares as Wynnefield had

9

bought in October 2000, the last time Obus believed he had seen such a large block of shares available for purchase. JA 1126 201:7-16; 1127-28 204:15-205:5; 1137 221:5-7; 2407. On June 11, 2001, Wynnefield sold 6,000 shares of SunSource. JA 2407.

**G. Allied's Acquisition of SunSource**

On June 19, 2001, Allied publicly announced that it was acquiring SunSource for $10.38 per share in cash or stock. JA 2344. SunSource's stock closed that day at $9.50 per share, an increase of $4.54 (or 91.5 percent) over the prior day's closing price. JA 1856-57 812:15-814:21. Wynnefield's June 8, 2001 purchase of SunSource stock nearly doubled in value (from the $4.75 purchase price to $9.50), producing a paper profit to Wynnefield of over $1.3 million. JA 2407. On June 19 and June 20, Wynnefield purchased another 150,000 shares of SunSource at prices over $9.40 per share. JA 2407.

**H. Obus's Call to Russell**

In June or July 2001, Obus contacted Andrien to ask when the merger with Allied would close; Andrien referred Obus to Daniel Russell, Allied's CFO. JA 1232 378:11-379:14; 1804 709:4-24. Obus and Russell's recollections of their phone call differ. Obus testified that he called to express his preference to be paid in Allied stock, rather than in cash, and to ask that Allied extend the closing date of the merger to lower Wynnefield's tax liabilities. JA 1232 379:11-18; 1373-74 195:14-196:16. Russell testified that Obus told him that Obus "was tipped off to the deal"

10

between Allied and SunSource, and when Russell asked what that meant, Obus changed the subject. JA 2190 202:6-204:1.

**I. The 2002 SEC Subpoenas**

In July and August 2002, the SEC subpoenaed Obus and Black about the SunSource trades. JA 2410-19; 2429-34. On August 8, 2002, Strickland also received an SEC subpoena and contacted Black to arrange a meeting. JA 2420-28; 837-38 123:14-125:15. Black told Obus about Strickland's request to meet, realizing that Strickland might want to discuss the subpoenas. JA 849-50 144:22-145:22; 998-99 153:10-154:10; 1093 147:6-19; 838 125:16-24. Obus and Black agreed that Black should try to avoid discussing SunSource or the subpoenas and encourage Strickland to be truthful. JA 1095 150:5-18; 1100 158:4-21; 1102 161:1-9; 1369 187:4-14; 1370 188:14-25.

At their meeting, Strickland told Black that he had informed GE Capital's counsel that he did not recall any conversation about SunSource. JA 315-16 152:25-153:19; 317 157:25-158:10; 401 126:3-127:18. Black reminded Strickland that they had discussed SunSource in May 2001, before the acquisition was announced. JA 317 159:18-23; 401 127:3-18; 867 174:11-17; 871 180:3-181:1. When Black told Obus about the meeting, Obus told Black to tell Strickland about Obus's conversation with Andrien, and to encourage Strickland to tell GE Capital's counsel about the May conversation between Black and Strickland. JA 999 154:25-155:9; 877-78 190:17-191:11; 1099-1100 157:16-21.

**J.    GE Capital's Internal Investigation**

After receiving the SEC's subpoena related to SunSource, GE Capital conducted an internal investigation into Strickland's conduct.  JA 2408-09.  The internal investigation did not go beyond interviewing Strickland and other GE Capital employees and thus did not include statements from Andrien or Russell.  JA 459 68:20-69:7; 460 70:15-71:12; 487-88 125:22-126:9.  The investigation concluded that while Strickland had "disclosed information outside of [GE Capital] pertaining to" SunSource, JA 463 76:2-12, he "did not discuss the nature of the specific transaction being contemplated," JA 2408.  Nevertheless, his conduct demonstrated a "disregard" of GE Capital's "confidentiality restrictions."  JA 2408.  Following the investigation, Strickland was denied a bonus and salary increase, but was not terminated.  A letter of reprimand was placed in his file stating that he should have consulted a manager or counsel before discussing SunSource with a third party.  JA 2408-09; 459 69:9-24; 469 89:5-18.  Testifying later, a representative of GE Capital said that the investigation concluded that Strickland "made a mistake" but was "trying to do some underwriting" when he called Black.  JA 490 131:8-14; 468-69 87:25-88:8; 487 125:7-9.

**II.  Prior Proceedings**

The SEC filed a civil complaint against Strickland, Black and Obus on April 25, 2006, that (as later amended on June 15, 2007) alleged that the defendants were liable for insider trading in violation of section 10(b) and Rule 10b-5 under both the classical

12

and the misappropriation theories of insider trading.  Under the classical theory, the SEC alleged that Strickland, through his work for GE Capital, became a temporary insider of SunSource and owed a duty to SunSource's shareholders not to share material non-public information about the company's acquisition.  Under the misappropriation theory, the SEC claimed that Strickland had a duty to GE Capital, his employer, to keep information about SunSource's acquisition confidential, and that he breached that duty by tipping Black.

The district court granted the defendants' summary judgment motion on both theories, SEC v. Obus, No. 06-civ-3150(GBD), 2010 WL 3703846, 2010 U.S. Dist. LEXIS 98895 (S.D.N.Y. Sept. 20, 2010), but the SEC appeals only with respect to the misappropriation theory. In the portion of its decision addressing that theory, the district court held that, even assuming Strickland told Black material non-public information about the SunSource/Allied deal, the SEC had failed to establish a genuine issue of fact as to whether Strickland breached a fiduciary duty to his employer, GE Capital. 2010 WL 3703846, at *15, 2010 U.S. Dist. LEXIS 98895, at *48.  The district court based this finding on GE Capital's internal investigation, which concluded that Strickland had not breached a duty to his employer, and on the fact that SunSource was not placed on GE Capital's Transaction Restricted List until after the SunSource acquisition was publicly announced.  Id.  The district court further held that the SEC failed to establish facts

13

sufficient for a jury to find that Strickland's conduct was deceptive. 2010 WL 3703846, at *14-15, 2010 U.S. Dist. LEXIS 98895, at *47. Because the district court found that Strickland had not breached a duty, neither Black nor Obus could have inherited that duty, and thus they also could not be held liable under the misappropriation theory. Finally, the district court held that the SEC failed to present sufficient evidence that Obus "subjectively believed that the information he received was obtained in breach of a fiduciary duty." 2010 WL 3703846, at *16, 2010 U.S. Dist. LEXIS 98895, at *50-51.

## DISCUSSION

## I.   Standard of Review

We review de novo the district court's grant of summary judgment. Huppe v. WPCS Int'l Inc., 670 F.3d 214, 217 (2d Cir. 2012). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[1] A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In reviewing a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to

---

[1] Rule 56 was amended in a non-substantive manner after the district court granted summary judgment. We cite the current version of the Rule.

14

be drawn in [its] favor." Id. at 255.

**II.  Legal Background**

    **A.  The Misappropriation Theory of Insider Trading**

Insider trading--unlawful trading in securities based on material non-public information--is well established as a violation of section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5.  See Dirks v. SEC, 463 U.S. 646, 653-54 (1983); Chiarella v. United States, 445 U.S. 222, 226-30 (1980); SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 847-48 (2d Cir. 1968) (en banc); In re Cady, Roberts & Co., 40 S.E.C. 907 (1961).  Under the classical theory of insider trading, a corporate insider is prohibited from trading shares of that corporation based on material non-public information in violation of the duty of trust and confidence insiders owe to shareholders.  Chiarella, 445 U.S. at 228.  A second theory, grounded in misappropriation, targets persons who are not corporate insiders but to whom material non-public information has been entrusted in confidence and who breach a fiduciary duty to the source of the information to gain personal profit in the securities market.  United States v. O'Hagan, 521 U.S. 642, 652 (1997); United States v. Chestman, 947 F.2d 551, 566 (2d Cir. 1991) (en banc).  Such conduct violates section 10(b) because the misappropriator engages in deception (as required for liability under that section and Rule 10b-5) by pretending "loyalty to the principal while secretly converting the principal's information for personal gain."  O'Hagan, 521 U.S. at 653 (internal

15

quotation marks omitted).  The requirement under section 10(b) that the deception be "in connection with the purchase and sale of any security" is met because the information is "of a sort that [can] ordinarily [be] capitalize[d] upon to gain no-risk profits through the purchase or sale of securities."  Id. at 656; United State v. Falcone, 257 F.3d 226, 233-34 (2d Cir. 2001).  This appeal is concerned only with liability under the misappropriation theory.

One who has a fiduciary duty of trust and confidence to shareholders (classical theory) or to a source of confidential information (misappropriation theory) and is in receipt of material non-public information has a duty to abstain from trading or to disclose the information publicly.  The "abstain or disclose" rule was developed under the classical theory to prevent insiders from using their position of trust and confidence to gain a trading advantage over shareholders.  See Chiarella, 445 U.S. at 227-30; Dirks, 463 U.S. at 660.  "Abstain or disclose" has equal force in the misappropriation context, but the disclosure component operates somewhat differently.  Because the misappropriation theory is based on a fiduciary duty to the source of the information, only disclosure to the source prevents deception; disclosure to other traders in the securities market cannot cure the fiduciary's breach of loyalty to his principal.  O'Hagan, 521 U.S. at 655; see Moss v. Morgan Stanley Inc., 719 F.2d 5, 13 (2d Cir. 1983) (fiduciary duty of disclosure to employer does not imply duty to disclose to the public).  Under either theory, if disclosure is impracticable or

prohibited by business considerations or by law, the duty is to abstain from trading.  See United States v. Teicher, 987 F.2d 112, 120 (2d Cir. 1993).

**B.    Tipping Violations of Insider Trading Laws**

The insider trading case law is not confined to insiders or misappropriators who trade for their own account.  Section 10(b) and Rule 10b-5 also reach situations where the insider or misappropriator tips another who trades on the information.  In Dirks, 463 U.S. 646, the Court addressed the liability of an analyst who received confidential information about possible fraud at an insurance company from one of the insurance company's former officers.  Id. at 648-49.  The analyst relayed the information to some of his clients, and some of them, in turn, sold their shares in the insurance company based on the analyst's tip.  Id.  The Court held that a tipper like the analyst in Dirks is liable if the tipper breached a fiduciary duty by tipping material non-public information, had the requisite scienter (to be discussed momentarily) when he gave the tip, and personally benefited from the tip.  Id. at 660-62.  Personal benefit to the tipper is broadly defined:  it includes not only "pecuniary gain," such as a cut of the take or a gratuity from the tippee, but also a "reputational benefit" or the benefit one would obtain from simply "mak[ing] a gift of confidential information to a trading relative or friend."  Id. at 663-64.  When an unlawful tip occurs, the tippee is also liable if he knows or should know that the information was received

17

from one who breached a fiduciary duty (such as an insider or a misappropriator) and the tippee trades or tips for personal benefit with the requisite scienter.  See id. at 660.  The Supreme Court's tipping liability doctrine was developed in a classical case, Dirks, but the same analysis governs in a misappropriation case. See Falcone, 257 F.3d at 233.

**C.   Scienter**

Liability for securities fraud requires proof of scienter, defined as "a mental state embracing intent to deceive, manipulate, or defraud."  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 & n.12 (1976).  Negligence is not a sufficiently culpable state of mind to support a section 10(b) civil violation.  Id.  While the Supreme Court has yet to decide whether recklessness satisfies section 10(b)'s scienter requirement, see Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1323 (2011), we have held that scienter "may be established through a showing of reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care," SEC v. McNulty, 137 F.3d 732, 741 (2d Cir. 1998) (internal citations and quotation marks omitted); see SEC v. U.S. Envtl., Inc., 155 F.3d 107, 111 (2d Cir. 1998) (recognizing that eleven circuits hold that recklessness satisfies the scienter requirement of section 10(b)).  We read the scienter requirement set forth in Hochfelder (and the recklessness variation in McNulty) to apply broadly to civil securities fraud liability,

18

including insider trading (under either the classical or misappropriation theory), and to tipper/tippee liability. <u>See, e.g.</u>, <u>Elkind v. Liggett & Myers, Inc.</u>, 635 F.2d 156, 167-68 (2d Cir. 1980). In every insider trading case, at the moment of tipping or trading, just as in securities fraud cases across the board, the unlawful actor must know or be reckless in not knowing that the conduct was deceptive.

With this background, we turn specifically to the scienter requirements for both tippers and tippees under the misappropriation theory.

**1. Tipper Scienter**

To be held liable, a tipper must (1) tip (2) material non-public information (3) in breach of a fiduciary duty of confidentiality owed to shareholders (classical theory) or the source of the information (misappropriation theory) (4) for personal benefit to the tipper. The requisite scienter corresponds to the first three of these elements. First, the tipper must tip deliberately or recklessly, not through negligence. Second, the tipper must know that the information that is the subject of the tip is non-public and is material for securities trading purposes, or act with reckless disregard of the nature of the information. Third, the tipper must know (or be reckless in not knowing) that to disseminate the information would violate a fiduciary duty. While the tipper need not have specific knowledge of the legal nature of

19

a breach of fiduciary duty, he must understand that tipping the information would be violating a confidence.

As the Supreme Court and commentators have recognized, the first and second aspects of scienter—a deliberate tip with knowledge that the information is material and non-public--can often be deduced from the same facts that establish the tipper acted for personal benefit. See Dirks, 463 U.S. at 663-64 (holding that the inquiry into the tipper's scienter "requires courts to focus on objective criteria, i.e., whether the insider receives a direct or indirect personal benefit from the disclosure"); Donald C. Langevoort, Insider Trading: Regulation, Enforcement, and Prevention § 4.04[1] (1992 ed.) ("The requirement that the tipper act with scienter . . . is effectively subsumed in proof that the insider's motive was personal benefit."). The inference of scienter is strong because the tipper could not reasonably expect to benefit unless he deliberately tipped material non-public information that the tippee could use to an advantage in trading. The third aspect of scienter, that the tipper acted with knowledge that he was violating a confidence, will often be established through circumstantial evidence. Because the act of misappropriation itself is deceitful, O'Hagan, 521 U.S. at 653, evidence that the tipper knowingly misappropriated confidential information will support an inference that the misappropriator had "a mental state embracing intent to deceive, manipulate, or defraud," Hochfelder, 425 U.S. at 193 n.12.

20

Because a defendant cannot be held liable for negligently tipping information, see Hochfelder, 425 U.S. at 193 & n.12, difficult questions may arise when a tip is not apparently deliberate or when the alleged tipper's knowledge is uncertain. The line between unactionable negligence and actionable recklessness is not a bright one. But, we have held that a tipper cannot avoid liability merely by demonstrating that he did not know to a certainty that the person to whom he gave the information would trade on it. "One who deliberately tips information which he knows to be material and non-public to an outsider who may reasonably be expected to use it to his advantage has the requisite scienter. . . . One who intentionally places such ammunition in the hands of individuals able to use it to their advantage on the market has the requisite state of mind . . . ." Elkind, 635 F.2d at 167. Moreover, conscious avoidance can be sufficient to establish tipper scienter. United States v. Gansman, 657 F.3d 85, 94 (2d Cir. 2011) (approving jury instructions that allowed the jury to consider "whether [the defendant tipper] deliberately closed his eyes to what would otherwise have been obvious to him"). By the same token, there is a valid defense to scienter if the tipper can show that he believed in good faith that the information disclosed to the tippee would not be used for trading purposes. See id.

Assume two scenarios with similar facts. In the first, a commuter on a train calls an associate on his cellphone, and,

speaking too loudly for the close quarters, discusses confidential information and is overheard by an eavesdropping passenger who then trades on the information. In the second, the commuter's conversation is conducted knowingly within earshot of a passenger who is the commuter's friend and whom he also knows to be a day trader, and the friend then trades on the information. In the first scenario, it is difficult to discern more than negligence and even more difficult to ascertain that the tipper could expect a personal benefit from the inadvertent disclosure. In the second, however, there would seem to be at least a factual question of whether the tipper knew his friend could make use of material non-public information and was reckless in discussing it in front of him. Similarly, there would be a question of whether the tipper benefited by making a gift of the non-public information to his friend, or received no benefit because the information was revealed inadvertently through his poor cellphone manners.

**2. Tippee Scienter**

Like a tipper, a liable tippee must know that the tipped information is material and non-public. And a tippee must have some level of knowledge that by trading on the information the tippee is a participant in the tipper's breach of fiduciary duty. This last element of tippee scienter was addressed in <u>Dirks</u>, which held that a tippee has a duty to abstain or disclose "only when the insider has breached his fiduciary duty . . . and the tippee <u>knows or should know</u> that there has been a breach." 463 U.S. at 660

22

(emphasis added).  In such a case, the tippee is said to "inherit" the tipper's duty to abstain or disclose.  The parties dispute whether the Dirks rule is in conflict with Hochfelder's holding that negligence does not satisfy section 10(b)'s scienter requirement because the "knows or should know" rule, repeated in numerous Second Circuit cases,[2] sounds somewhat similar to a negligence standard.  See Restatement (Third) of Torts § 3, cmt. g (2010) (negligence requires foreseeability, which "concerns what the actor 'should have known'").  We think the best way to reconcile Dirks and Hochfelder in a tipping situation is to recognize that the two cases were not discussing the same knowledge requirement when they announced apparently conflicting scienter standards.  Dirks' knows or should know standard pertains to a

_____

[2] See, for example, SEC v. Warde, 151 F.3d 42, 47 (2d Cir. 1998) (SEC must establish that tippee "knew or should have known that [tipper] violated a relationship of trust by relaying [the] information"); Falcone, 257 F.3d at 229 (tippee "assumes a fiduciary duty" when "the tippee knows or should know that there has been a breach" ( internal quotation marks omitted)); SEC v. Monarch Fund, 608 F.2d 938, 942 (2d Cir. 1979) (distinguishing "the tippee who knows or ought to know that he is trading on inside information" from "the outsider who has no reason to know he is trading on the basis of such knowledge").

Our only case to vary from this formulation is United States v. Mylett, 97 F.3d 663 (2d Cir. 1996).  In Mylett we stated that a tippee must "subjectively believe that the information received was obtained in breach of a fiduciary duty."  Id. at 668.  For that proposition Mylett cited a statement from Chestman, 947 F.2d at 570, that the defendant tippee "knew" that the tipper had breached a duty.  An earlier discussion in Chestman, however, gives the familiar Dirks "knows or should know" standard.  947 F.2d at 565.  In Mylett it was clear that the defendant "knew" that the tipper "held a position of trust and confidence" at the company the tip concerned, so there was no need for the court to examine the "should know" standard from Dirks.  97 F.3d at 667-68.

tippee's knowledge that the tipper breached a duty, either to his corporation's shareholders (under the classical theory) or to his principal (under the misappropriation theory), by relaying confidential information. This is a fact-specific inquiry turning on the tippee's own knowledge and sophistication, and on whether the tipper's conduct raised red flags that confidential information was being transmitted improperly. Hochfelder's requirement of intentional (or McNulty's requirement of reckless) conduct pertains to the tippee's eventual use of the tip through trading or further dissemination of the information. Thus, tippee liability can be established if a tippee knew or had reason to know that confidential information was initially obtained and transmitted improperly (and thus through deception), and if the tippee intentionally or recklessly traded while in knowing possession of that information.

**D. Tipping Chains**

One last question presented by this case is how a chain of tippers affects liability. Such chains of tipping are not uncommon, see, e.g., Dirks, 463 U.S. at 649-50; Falcone, 257 F.3d at 227; United States v. McDermott, 245 F.3d 133, 135-36 (2d Cir. 2001); and follow the same basic analysis outlined above. A tipper will be liable if he tips material non-public information, in breach of a fiduciary duty, to someone he knows will likely (1) trade on the information, or (2) disseminate the information further for the first tippee's own benefit. The first tippee must

24

both know or have reason to know that the information was obtained and transmitted through a breach, and intentionally or recklessly tip the information further for her own benefit.  The final tippee must both know or have reason to know that the information was obtained through a breach, and trade while in knowing possession of the information.  Chain tippee liability may also result from conscious avoidance.  See SEC v. Musella, 678 F. Supp. 1060, 1063 (S.D.N.Y. 1988) (finding scienter satisfied where the defendants, tippees at the end of a chain, "did not ask [about the source of information] because they did not want to know").

\*                    \*                    \*

To summarize our discussion of tipping liability, we hold that tipper liability requires that (1) the tipper had a duty to keep material non-public information confidential; (2) the tipper breached that duty by intentionally or recklessly relaying the information to a tippee who could use the information in connection with securities trading; and (3) the tipper received a personal benefit from the tip.  Tippee liability requires that (1) the tipper breached a duty by tipping confidential information; (2) the tippee knew or had reason to know that the tippee improperly obtained the information (i.e., that the information was obtained through the tipper's breach); and (3) the tippee, while in knowing possession of the material non-public information, used the information by trading or by tipping for his own benefit.

**III. Application**

Applying these standards to the defendants in this case, we conclude that the SEC presented sufficient evidence to create genuine issues of material fact as to Strickland's, Black's, and Obus's liability under the misappropriation theory.

**A.    Strickland**

Turning first to Strickland, the SEC presented sufficient evidence to survive summary judgment.  First, it is undisputed that Strickland, an employee of GE Capital, owed GE Capital a fiduciary duty.  See O'Hagan, 521 U.S. at 654 (holding that a company's confidential information "qualifies as property" and "undisclosed misappropriation of such information . . . by an employee violate[s] a fiduciary duty"); Restatement (Third) of Agency § 8.05 (2006) ("An agent has a duty . . . not to use or communicate confidential information of the principal for the agent's own purposes or those of a third party.").  Moreover, the SEC presented sufficient evidence that Strickland knew he was under an obligation to keep information about the SunSource/Allied deal confidential, including Strickland's testimony that he knew it was confidential, the deal book that had every page marked "Extremely Confidential," and Strickland's annual review of GE Capital's employee code of conduct, which contained provisions on confidentiality.  While the defendants make much of SunSource's absence from GE Capital's Transaction Restricted List until after the deal was publicly announced, this fact is not determinative to our analysis.

26

Moreover, there is a separate question of fact whether it was Strickland himself who should have added SunSource to the list at an earlier date. Thus there is sufficient evidence that Strickland knew he owed GE Capital a duty to keep information about the SunSource/Allied acquisition confidential and not to convert it for his own profit.

More hotly disputed is whether the SEC presented sufficient evidence to allow a jury to conclude that Strickland told Black that SunSource was about to be acquired--i.e., whether the alleged tip actually occurred.[3] As is often the case, there is no direct evidence that Strickland tipped Black; both maintained in depositions that Strickland asked Black general questions about SunSource's management as part of his due diligence work, but revealed nothing about a sale to Allied. However, we have never held that a tip needs to be established by direct evidence (indeed, such a requirement would restrict successful tipping cases to those in which at least one party cooperated with the government, or where the government had a court-authorized surreptitious recording). See McDermott, 245 F.3d at 139. In McDermott, we found that the government had presented enough evidence to prove the content of a tip beyond a reasonable doubt based only on

---

[3] There is no dispute that if Strickland passed along such information, it would have qualified as material and non-public. Unannounced acquisitions are a prototypical example of material non-public information. Basic Inc. v. Levinson, 485 U.S. 224, 238-39 (1988); SEC v. Warde, 151 F.3d at 47 (the materiality of a planned acquisition is "not open to doubt").

27

evidence that the tipper and tippee were having an affair and frequently spoke to each other on the phone; the tippee greatly increased her trading activities after the affair began; the tippee frequently traded in stocks about which the tipper had confidential information; the timing of the phone calls and trades was consistent with tipping; and the tippee's trades were profitable. Id. at 138-39; see also Warde, 151 F.3d at 47-48 (pattern of phone calls and trades can support an inference of tipping). Here, the SEC presented the following evidence:

(1) Strickland and Black, who were college friends, had a conversation about SunSource on May 24, 2001, three days after GE Capital submitted its financing proposal to SunSource. Strickland's superiors stated that contacting shareholders was not part of due diligence, and Strickland himself had never done so in the past.

(2) Black immediately told his superior, Obus, about the conversation, and Obus immediately called Andrien to tell him, as Andrien testified, that he had heard from "a little birdie in Connecticut" that SunSource was planning to sell the company to a financial buyer. When Andrien asked who the little birdie was, Obus responded that it was GE.

(3) Wynnefield purchased a large block of stock about two weeks after the conversation by increasing a broker's offer of 50,000 shares to an actual purchase of 287,200

28

shares. After SunSource's acquisition was publicly announced, this investment nearly doubled in value.

(4) In a later conversation between Obus and Russell, Obus told Russell that he had been "tipped off about the [SunSource] deal."

(5) Black and Strickland met to discuss the case immediately after Strickland was subpoenaed by the SEC. They subsequently provided very similar accounts of the May 24 conversation (contradicted by the testimony of Andrien and Russell). Prior to the meeting with Black, Strickland had told GE Capital's counsel that he did not remember having any conversation with Black about SunSource.

To be sure, the defendants challenge the credibility of much of this evidence and point to other facts that suggest a more innocent explanation. However, on summary judgment, the district court was required to credit the testimony relied on by the SEC and to draw all inferences in its favor. A rational jury could reasonably infer from the SEC's evidence that Strickland did tell Black that SunSource was about to be acquired.

In addition, the SEC presented sufficient evidence for a jury to find that Strickland knew the material non-public information was "ammunition" that Black was in a position to use. See Elkind, 635 F.2d at 167. Strickland knew that Black worked for a hedge fund that traded in stocks (sufficient knowledge in itself) and, additionally, that Black's hedge fund traded in SunSource shares.

29

This evidence easily supports a finding of knowing or reckless tipping to someone who likely would use the information to trade in securities.

The district court relied on GE Capital's internal investigation to determine that Strickland breached no duty by tipping Black, reasoning that the alleged victim of the breach of fiduciary duty did not consider itself a victim. See Obus, 2010 WL 3703846, at *15, 2010 U.S. Dist. LEXIS 98895, at *48. This was error, however, because the internal investigation was not indisputably reliable, and because its conclusions were contradicted by other evidence. GE Capital's investigation was based only on interviews with Strickland and other GE Capital employees; it did not have the benefit of evidence from outside sources such as Andrien or Russell, the primary witnesses relied on by the SEC. More broadly, the GE investigation was motivated by corporate interests that may or may not coincide with the public interest in unearthing wrongdoing and affording a remedy. And finally, the conclusion of such an internal investigation cannot bind a jury, which will make its own independent assessment of the evidence. The jury, after reviewing the evidence, might conclude that Strickland simply "made a mistake" and did not breach his duty of confidentiality to GE Capital, or, that Strickland breached his duty by tipping. That factual dispute cannot be resolved on summary judgment.

Next, although the district court did not reach the issue, it is readily apparent that the SEC presented sufficient evidence that, if the tip occurred, Strickland made the tip intentionally and received a personal benefit from it. Dirks defined "personal benefit" to include making a gift of information to a friend. 463 U.S. at 664; see Warde, 158 F.3d at 48-49 (the "close friendship" between the alleged tipper and tippee was sufficient to allow the jury to find that the tip benefitted the tipper). Here, the undisputed fact that Strickland and Black were friends from college is sufficient to send to the jury the question of whether Strickland received a benefit from tipping Black. See Dirks, 463 U.S. at 664. This same evidence creates a question of fact with respect to whether Strickland intentionally tipped Black. And it is sufficient for a jury to conclude that Strickland intentionally or recklessly revealed material non-public information to Black, knowing that he was making a gift of information Black was likely to use for securities trading purposes. See Gansman, 657 F.3d at 94.

Finally, the district court erred by requiring the SEC to make an additional showing of "deception" beyond the tip itself. See Obus, 2010 WL 3703846, at *15, 2010 U.S. Dist. LEXIS 98895, at *48-50. As explained in O'Hagan, employees who misappropriate confidential information "deal in deception." 521 U.S. at 653. If the jury accepts that a tip of material non-public information occurred and that Strickland acted intentionally or recklessly,

31

Strickland knowingly deceived and defrauded GE Capital. That is all the deception that section 10(b) requires.

The SEC thus presented sufficient evidence to establish a genuine issue of material fact with respect to whether Strickland tipped Black, whether Strickland knowingly or recklessly breached a duty to his employer by doing so, whether Strickland knew there was a high likelihood that the tip would result in the trading of securities, and whether Strickland tipped for his own personal benefit. The district court therefore erred in granting summary judgment to Strickland.

**B.    Black**

Assessing Black's tippee liability requires us to determine whether Black inherited Strickland's duty of confidentiality. Black's liability therefore depends first on whether Strickland breached a duty to his employer in tipping Black. See Dirks, 463 U.S. at 660. For the reasons already stated, we hold that there is sufficient evidence for a jury to so conclude.

Next, the SEC must establish that Black knew or should have known that Strickland breached a fiduciary duty when he passed along the tip, see id. at 660, and thus inherited Strickland's duty to abstain or disclose.[4]  Black, a sophisticated financial analyst,

---

[4] Here the duty to "disclose," as applied to Black, would have required Black to disclose his intention to trade to the source of the information, GE Capital, because Black inherited Strickland's duty, which was owed by Strickland to GE Capital. As noted in our previous discussion, if such disclosure was impracticable, Black's

testified that he knew Strickland worked at GE Capital, which provided loans to businesses; that he knew Strickland was involved in developing financing packages for other companies and performing due diligence; and that information about a non-public acquisition would be material inside information that would preclude someone from buying stock.  This is sufficient for the jury to conclude that Black knew or had reason to know that any tip from Strickland on SunSource's acquisition would breach Strickland's fiduciary duty to GE Capital.  See Warde, 151 F.3d at 48 (sufficient that tippee knew that the tipper was a director of the company with which the tip was concerned because a sophisticated party should know that board members cannot convey material non-public information to outsiders).  Such a conclusion of course would be reinforced should the jury find that Black deliberately lied to the SEC about his conversation with Strickland.

Because, according to the SEC, Black himself did not trade on the SunSource information but instead tipped his boss, Obus, the SEC must also present evidence that Black derived some personal benefit from relaying the tip.  In light of the broad definition of personal benefit set forth in Dirks, this bar is not a high one. Based on the evidence that Black worked for Obus and that Wynnefield traded in SunSource stock, a jury could find that by passing along what he was told by Strickland, Black hoped to curry

duty was to abstain from trading or disseminating the information further.

33

favor with his boss.  See Dirks, 463 U.S. at 663 (citing reputational advantage as an example of a personal benefit).  If a jury could find that Black conveyed Strickland's tip in order to improve his standing with Obus, it could also find that Black acted recklessly or intentionally in passing on the information. Moreover, because Black was well aware that Wynnefield held SunSource stock, the jury could find that he knew that there was a reasonable expectation that Obus would trade in SunSource on Wynnefield's behalf while in possession of the tip.  See Elkind, 635 F.2d at 167.  The SEC thus presented sufficient evidence to send the question of Black's liability to a jury.

**C.   Obus**

As the final alleged tippee in the chain, Obus's duty to abstain or disclose is derivative of Strickland's duty.  Therefore, his liability depends first on Strickland having breached a duty to GE Capital.  As explained above, the SEC has presented sufficient evidence on this issue.  Next, the SEC must show that Obus knew or had reason to know that the SunSource information was obtained through a breach of fiduciary duty.  While there was evidence that Black was aware of Strickland's precise position at GE Capital, there was not evidence that Obus had the same level of knowledge. We need not decide if Obus's bare knowledge that Strickland worked for GE Capital (of which there was evidence), along with Obus's status as a sophisticated financial player, was enough for Obus to have had reason to know that Strickland breached a duty to GE

34

Capital by talking to Black. Here, there is the additional evidence of Obus's call to Andrien and his conversation with Black about the call. From this, a jury could infer (1) that Obus believed Black's information was credible and thus knew that it originated from someone entrusted with confidential information; and (2) that Obus recognized that Strickland might lose his job as a result of the information he had conveyed to Black, demonstrating Obus's knowledge that Strickland had acted inappropriately. Taken together, this evidence is sufficient to allow a jury to infer that Obus was aware that Strickland's position with GE Capital exposed Strickland to information that Strickland should have kept confidential. The defendants counter by arguing that Obus's recollections of the conversation with Black and the call with Andrien would not permit the inference that Obus knew Strickland had breached a duty. But when the evidence is conflicting, it is the jury's task to decide whose testimony to credit and what conclusions to draw from that testimony.

Finally, the SEC must establish that Obus traded while in knowing possession of material non-public information. United States v. Royer, 549 F.3d 886, 899 (2d Cir. 2008). Obus argues that the June 8, 2001 SunSource purchase was not unusual for Wynnefield, that the trade was not initiated by Obus, and that Obus sold back some of the SunSource shares before the Allied deal was publicly announced. None of these facts are relevant to whether Obus was in knowing possession of material non-public information

35

when he traded on June 8. See Teicher, 987 F.2d at 120-21. The SEC's evidence that Obus told Andrien and later Russell that he bought the shares on a tip is sufficient for the jury to find that Obus subjectively knew he possessed material non-public information when he made the June 8 purchase, whether or not his purchase was directly caused by his knowledge of the pending acquisition.[5] See id. Accordingly, the SEC has established genuine questions of fact about whether Obus knew that Strickland had breached a duty to GE Capital and whether Obus traded in SunSource stock while in knowing possession of the material non-public information that SunSource was about to be acquired.

## CONCLUSION

For the foregoing reasons, the district court's order granting summary judgment to the defendants is VACATED and the case is REMANDED for further proceedings consistent with this opinion.

---

[5] The district court suggested that Obus's calls to Andrien might insulate Obus from liability because the calls were "hardly evidence of deception or stealth." Obus, 2010 WL 3703846, at *15, 2010 U.S. Dist. LEXIS 98895, at *49. This misapprehends the duty Obus inherited. If the SEC's evidence is believed, Strickland (and, derivatively, Black and Obus) owed a duty to GE Capital not to use information about SunSource for personal benefit. See supra n.4. Even if Obus had told Andrien that he was trading based on a tip, it would have done nothing to absolve Obus of his inherited duty to GE Capital, the source of the information. See O'Hagan, 521 U.S. at 654 n.6.

36